UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     Plaintiff,

  v.

STEVEN P. RACE and TIMOTHY M. RACE,

     Defendants.

_____

REPORT & RECOMMENDATION

11-CR-6157G

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated September 13, 2011, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 19).[1]

On September 13, 2011, the grand jury returned a five-count indictment charging defendants Steven Race ("Steven") and Timothy Race ("Timothy") with conspiracy to commit controlled substance offenses, in violation of 21 U.S.C. § 846.  (Docket # 18).  Both defendants are also charged with possession of marijuana with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); unlawfully manufacturing marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); using a premises for the purpose of manufacturing marijuana, in violation of 21 U.S.C. § 856(a)(1); and, possession of a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1).  (*Id.*).

Currently pending before the Court are motions by both defendants to suppress tangible evidence and statements, as to which evidentiary hearings were held.  (Docket ## 75,

_____

[1]  The case was subsequently reassigned to United States District Judge Frank P. Geraci, Jr.  (Docket # 62).

97, 106, 113). [2]  For the reasons discussed below, I recommend that the district court grant

defendants' motions to suppress tangible evidence seized from 203 Lake Road and evidence of

post-arrest statements made by Steven.  I further find that supplemental briefing on the

attenuation doctrine is appropriate before a decision may be made on Timothy's motion to

suppress evidence of post-arrest statements he made.

## FACTUAL BACKGROUND

### I.    Burns's Testimony

Officer Michael Burns ("Burns") testified that he had been employed by the

Webster Police Department ("WPD") for approximately sixteen years and had previously been

employed for approximately five years as an officer with the Rochester Police Department

("RPD").  (Tr. A 5). [3]  According to Burns, his responsibilities included enforcing laws and

ordinances and responding to 911 calls.  (Tr. A 6).

Burns testified that he responded to a 911 call on February 4, 2011, at

approximately 11:30 p.m.  (Tr. A 6).  According to Burns, as he was patrolling in his marked

police vehicle, he heard a 911 transmission concerning 203 Lake Road, Webster, New York.

(Tr. A 6-7, 15, 94).  At the time, Burns was accompanied by a high school senior ("M.H."), who

---

[2]  Defendants filed omnibus motions seeking other forms of relief.  Specifically, Steven also sought, *inter alia*, *Brady* material, discovery and inspection (Docket ## 56, 66), Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 97).  Timothy's omnibus motion also sought *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, identification of informants, joinder in co-defendant's motions, preservation of rough notes, severance of defendants, a Rule 12(b)(4) notice, an audibility hearing, to limit co-conspirator statements, disclosure of grand jury list and leave to file additional motions.  (Docket # 106).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on March 5, 2014 and April 28, 2014, respectively.  (Docket ## 101, 110).

[3]  The transcript of the June 21, 2013 hearing shall be referred to as "Tr. A __," the transcript of the March 24, 2014 hearing shall be referred to as "Tr. B __," the transcript of the April 25, 2014 hearing shall be referred to as "Tr. C __," and the transcript of the June 23, 2014 hearing shall be referred to as "Tr. D __.  (Docket ## 84, 118, 120, 130).

was riding with Burns as part of an extra credit program through her high school.  (Tr. A 17, 116).  Burns described the report as a "domestic violence call."  (Tr. A 7).  Prior to responding to the call, Burns was informed that the caller, Carolyn Race ("Mrs. Race"), had reported that an argument was occurring at 203 Lake Road involving an individual named Adam Kuhn, and that the caller's son was present at the location.  (Tr. A 10; Government's Exhibit ("G. Ex.") 1).

According to Burns, Mrs. Race had called WPD on multiple prior occasions to report incidents occurring at 203 Lake Road.  (Tr. A 10-11).  During the hearing, Burns reviewed WPD forms documenting previous calls to WPD about 203 Lake Road.  (Tr. A 96-113).  Those forms reflected approximately eight calls concerning 203 Lake Road between May 2010 and February 2011.  (*Id.*).  Of those calls, approximately seven were placed by Mrs. Race, including the phone call to which Burns responded on February 4, 2011.  (*Id.*).

The calls generally requested that WPD either check on the welfare of Mrs. Race's sons or remove persons from the premises at 203 Lake Road.  (*Id.*).  The calls were typically coded as "services rendered" or "no cause," which meant that "[t]here was no cause based on the officer's findings."  (Tr. A 101).  In one call, which was made only four days before the call at issue in this case, Mrs. Race reported that a female present at 203 Lake Road refused to leave the premises and that she wanted the female removed from that location.  (Tr. A 112).  When officers responded, they were informed by Mrs. Race's son that he was the legal tenant of the premises, that the female was a welcomed guest and that he wanted her to stay at the premises.  (Tr. A 113).  WPD records for that call indicate that the responding officer informed Mrs. Race to "no longer call her son per his request."  (*Id.*).  Although Burns testified that he had not been personally involved in responding to any of Mrs. Race's previous calls, he admitted that he was aware that she had frequently called the police concerning her sons, that some of the calls

3

were unsubstantiated and that she "might be less than stable with respect to the calls that she

made." (Tr. A 11, 156-57). Burns further testified that he did not consider the information about

Mrs. Race's reliability in responding to the February 4 call because WPD General Orders

required him to respond to the 911 call. (Tr. A 155-56).

According to Burns, he was required to respond to the February 4, 2011 call

pursuant to WPD General Order 442, which governs responses to calls of domestic disputes and

family offenses. (Tr. A 11-14). The Order directs an in-person investigation of reports of

domestic incidents and prohibits the reclassification of domestic incident reports without both an

investigation and supervisory approval.[4]  (Tr. A 14; G. Ex. 2). Burns testified that the Order was

mandatory and afforded no discretion to him not to respond. (Tr. A 15). According to Burns, he

was not aware of any specific information that any of the crimes encompassed in the Order's

definition of domestic violence offenses was occurring at 203 Lake Road.[5]  (Tr. A 84-85).

---

[4]  General Order 442 provides in relevant part:

> All reports of domestic incidents and domestic violence will be
> investigated in person by a member of the Webster Police Department.
> Under no circumstances will the nature of the call be reclassified unless
> a thorough investigation clearly proves no domestic incident has
> occurred and supervisory approval has been obtained.

(G. Ex. 2 § IV(A)).

[5]  General Order 442 provides in relevant part:

> Domestic Violence occurs when a member of one of the above
> described relationships commits or attempts to commit:
>
> 1. Any of the designated "Family Offenses" listed in the NYS Family
>    Court Act § 812;
> 2. Offenses such as Attempted Murder, Kidnapping, Rape, Unlawful
>    Imprisonment, Coercion, Arson, Endangering the Welfare of a
>    Child or Elderly Person, Strangulation, Criminal Obstruction of
>    Breathing or Circulation. . . .[;]
> 3. Repeated coercive acts or petty offenses which, taken singly, may
>    be non-criminal, but which instill fear of physical harm, may
>    warrant a charge of Harassment 1st or Menacing 2nd or 3rd. Such
>    a pattern may involve physical or verbal threats or damage to

4

After receiving the dispatch to 203 Lake Road, Burns also received a dispatch concerning a woman hitchhiking on Five Mile Line Road.  (Tr. A 89-90).  Burns testified that the incident on Five Mile Line Road was more urgent than the incident reported at 203 Lake Road, and he decided to respond to Five Mile Line Road first.  (Tr. A 89-90, 117).  Burns arrived at the Five Mile Line Road location within about one minute and at 203 Lake Road within approximately four to six minutes after receiving the calls.  (Tr. A 7, 117).

According to Burns, he arrived at 203 Lake Road at approximately 11:25 p.m. without activating his sirens or emergency lights.  (Tr. A 15; Tr. B 6).  At the time, he was wearing his police uniform, a bullet proof vest, ear microphone, gun, belt and badge.  (Tr. A 41).  M.H. was not wearing any protective equipment.  (Tr. A 119).  Burns told M.H. that he was responding to a domestic violence disturbance, which he described as "one of the more violent calls that [he] respond[ed] to."  (Tr. A 118).  Prior to exiting the vehicle, Burns radioed for backup and heard that Officer Brian McCoy ("McCoy") was responding to the scene.  (Tr. A 122-23).

Both Burns and M.H. exited the police car and approached the house, with Burns in the front and M.H. behind him.  (Tr. A 17).  WPD's General Order 525 directs that civilian riders "[w]ill stay in the police vehicle at in-progress calls."  (Defendant's Exhibit ("D. Ex.") S at § VI(D)).

According to Burns, he walked along the driveway on the west side of the dwelling and bypassed the first door that he observed because the path to the door was snow covered.  (Tr. A 16, 124-26; D. Ex. H).  He continued towards the back of the premises,

---

jointly held property, in order to manipulate and control the intimate partner or household/family member.

4.   Acts which violate the terms of an Order of Protection issued by the Family, Criminal or Supreme Courts.

following a "beaten path of snow" that contained footprints.  (Tr. A 16-17).  As he walked

alongside the premises, Burns passed a closed window and heard two voices speaking in a

conversational tone.  (Tr. A 18, 36-37, 123).

Burns walked up to a porch leading to the back door; as he did, he smelled raw,

dried marijuana and also heard voices inside, which again sounded like two people conversing.

(Tr. A 36-37, 39-40, 127-29, 131).  Burns banged on the door.  (*Id.*).  According to Burns,

everything went silent.  (Tr. A 38, 131).  Burns then rang the doorbell and yelled, "Police

Department."  (Tr. A 38-39, 131).  Burns testified that he then heard fast-paced footsteps in the

house.  (Tr. A 39, 132).  According to Burns, M.H. remained behind him on the steps leading to

the porch.  (Tr. A 136).

Through the exterior door, Burns observed an interior door open and a man, later

identified as Steven, emerge from inside the house and walk towards the exterior door.  (Tr. A

40-41, 132).  Burns testified that he may have used his microphone to transmit a message about

the running footsteps inside the home.  (Tr. A 132).  As Steven opened the door, Burns was

"overwhelmed with the smell of marijuana."  (Tr. A 41-42, 47).

Steven identified himself and asked Burns why he was there.  (Tr. A 42).  Burns

informed Steven that he was there to investigate a domestic violence call, and Steven replied that

there was nothing going on at the house.  (Tr. A 42; Tr. B 6-8).  Burns told Steven that he was

responding to a call placed by Carolyn Race.  (*Id.*).  Steven told Burns that Carolyn Race was his

mother and that her calls were harassment.  (Tr. A 43; Tr. B 6-7).  Burns then asked Steven who

was inside the house.  (Tr. A 43).  Steven replied that nobody else was inside.  (*Id.*).  Burns told

Steven that he "want[ed] to investigate" the phone call and requested permission to go inside the

house to speak to the individuals inside.  (Tr. A 43-44).  Steven told Burns that nobody was inside the house and that he could not enter the house.  (Tr. A 44; Tr. B 8).

Burns testified that he believed that exigent circumstances existed to warrant his entry into the house.  (Tr. A 44).  First, he was concerned about the domestic violence call and knew that other people were inside the house, that Steven had lied to him, and that he had heard people running in the house.  (Tr. A 44-45).  These circumstances led him to believe that someone inside the house might be a victim of assault or harassment.  (*Id.*).  Second, the overwhelming smell of marijuana, along with the sound of running feet, caused him to be concerned that individuals in the house were either destroying evidence or running for a weapon.  (*Id.*).

Burns entered the house through the exterior door into an enclosed porch or "mud room."  (Tr. A 46).  From his vantage point inside the mud room, Burns could see a portion of the kitchen.  (Tr. A 134-35; G. Ex. 10).  Burns pushed Steven against the wall of the mud room, directing him to "put your fucking hands behind your back."  (Tr. A 46, 137; Tr. B 9-10; G. Ex. 7).  Burns handcuffed Steven's hands behind his back, performed a brief pat down of his outer clothing, and went through the interior door.  (Tr. A 46, 138).  Burns instructed M.H. to "stay with [him]."  (Tr. A 138-39).  According to Burns, he drew his firearm and announced, "Police Department."  (Tr. A 46).  Burns testified that he wanted M.H. to remain with him because he knew that other individuals were present and had run, but he did not know where they were.  (Tr. A 156).  From the threshold of the interior door, Burns observed cultivated marijuana and cutting tools on the kitchen table located to the left of the interior door.  (Tr. A 46; G. Ex. 10).

As Burns moved into the house, he held his firearm in his right hand and directed Steven into the room first by pushing and dragging him by the handcuffs, which he held in his

left hand.[6]  (Tr. A 47, 140; Tr. B 10-11).  M.H. followed behind Burns.  (Tr. A 141).  Burns then

addressed Steven, "Don't fuck with me here.  Who is in the house?"  (Tr. A 47, 52-54).  Burns

testified that as he proceeded through the kitchen scanning for anyone who might pose a threat,

he observed an open stairwell to the second floor.  (Tr. A 49, 52-55, 142).  Burns remained in the

kitchen because he was concerned that someone could descend the stairs and surprise him.

(Tr. A 49, 54-55, 142).

Burns testified that while still in the kitchen, he observed Officer McCoy in the

premises with two individuals.  (Tr. A 48, 142-43; G. Ex. 10).  According to Burns, he did not

see McCoy enter the house.  (Tr. A 48-49).  Burns testified that when he first observed him,

McCoy was located by the door between the living room and the enclosed front porch.  (Tr. A

146-47; D. Ex. J).  According to Burns, both he and McCoy were ordering the occupants to show

their hands and shouting "Police."  (Tr. A 48-49).  According to Burns, the occupants complied

with the officers' commands.  (Tr. A 50).

Burns testified that he and McCoy "simultaneously locked down the first floor" in

less than one minute.  (Tr. A 55, 58).  According to Burns, the first floor of the premises

consisted of the mud room, kitchen area, living area and a foyer.  (Tr. A 48, 53, 55-56).  In the

living area, there was a couch, a television, a stereo and a drying rack in the corner of the room.

(Tr. A 55-56, 127).  Burns could not recall whether the television or stereo were on when he

entered the premises.  (Tr. A 127).  According to Burns, the drying rack had three levels and

each level contained harvested marijuana.  (Tr. A 56-57; G. Ex. 8-9).  The rack was readily

visible from Burns's vantage point.  (Tr. A 57).  According to Burns, neither the marijuana on

---

[6]  During the hearing, the government represented that it would not seek to introduce any statements made by Steven after he was handcuffed, but before he was advised by Burns of his *Miranda* rights.  (Tr. B 10).

the rack nor the marijuana on the table were completely dry, although it was in the process of being dried.  (Tr. A 147-48).

At that point, Sergeant Kohlmeier arrived and entered the premises.  (Tr. A 58).  According to Burns, Sergeant Kohlmeier and McCoy continued to conduct a protective sweep of the house, while he removed Steven from the location and placed him in his patrol vehicle.  (Tr. A 58-59).  According to Burns, he removed Steven from the premises within ten minutes of his arrival at 203 Lake Road.  (Tr. B 11).  The two other individuals in the house were also removed from the premises.  (Tr. A 59).

As he walked Steven to his patrol car, Burns recited the *Miranda* warnings to him.  (Tr. B 11-12).  According to Burns, he did not read the warnings from a preprinted card, but instead recited them from memory.  (*Id.*).  To the best of his recollection, Burns told Steven the following:

> You have the right to remain silent.  You don't have to say anything you don't want to.  Anything you do say can be used against you in a court of law.  You have a right to a lawyer before answering questions, have him or her here with you.  If you can't pay for a lawyer, one will be given to you before any questions if you wish.  If you do wish to talk to me, you can stop at any time.

(Tr. B 12-14).

Burns then asked Steven two waiver questions from memory, after which Burns placed him in the patrol vehicle.  (Tr. B 14, 16).  Burns entered the patrol vehicle and recorded Steven's answers to the waiver questions on a notification and waiver card.  (Tr. B 14-17, 19-20; G. Ex. 1A[7]).  According to the card, Burns asked Steven whether he understood what Burns had

---

[7]  During the hearing, this exhibit was admitted as Government's Exhibit 1.  (Tr. B 18).  During two other hearings in this case on March 24, 2014 and June 23, 2014, two different exhibits were admitted as Government's Exhibit 1.  (Tr. A 8; Tr. D 9).  To avoid confusion, the exhibit admitted during the March 24, 2014 hearing will be referred to herein as "Government's Exhibit 1," the exhibit admitted during the June 21, 2013 hearing will be

said to him, and Steven replied, "Yes." (*Id.*).  Burns then asked Steven whether he would agree

to talk with Burns, to which Steven replied, "Well, yeah." (*Id.*).  According to Burns, he made

the remaining notations on the card after Steven had been transported to WPD and placed in a

holding cell.  (Tr. B 16-17).  Burns testified that he administered the *Miranda* warnings at

approximately 11:39 p.m.  (Tr. B 19).

Burns transported Steven to WPD, arriving shortly before midnight.  (Tr. B

21-22).  During the transport, Burns did not ask Steven any questions, but Steven complained

that Burns had entered his house without a warrant and that the 911 call from his mother

constituted harassment.  (Tr. B 24-25).  Burns responded to Steven's statements by telling him to

be quiet.  (Tr. B 25, 40).  As Burns was escorting Steven into the police department, Burns asked

Steven whether he had completed the twelfth grade.  (Tr. B 42).  Steven indicated that he had,

and Burns subsequently recorded that answer on the notification and waiver card.  (Tr. B 42;

G. Ex. 1A).  Burns placed Steven into a holding cell at approximately 11:58 p.m.  (Tr. B 23, 31;

G. Ex. 10A[8]).  Burns testified that he did not inform Officer Cayward, who subsequently

interviewed Steven, that he had previously administered *Miranda* warnings to Steven.  (Tr. B 26,

46-47).

Burns testified that during his encounter with Steven, he did not appear to be

under the influence of any drugs or alcohol.  (Tr. B 21, 42-43).  Burns also testified that he did

not make any threats or promises to induce Steven to speak.  (Tr. B 26, 39).  According to Burns,

---

referred to as "Government's Exhibit 1A" and the exhibit admitted during the June 23, 2014 hearing will be referred
to as "Government's Exhibit 1B."

[8] There are two exhibits that were both marked as Government's Exhibit 10.  To avoid confusion, the
Court will refer to the exhibit marked Government's Exhibit 10 that was received during the March 24, 2014 hearing
as Government's Exhibit 10A.

Steven never indicated that he did not want to speak to him and never invoked any of his *Miranda* rights.  (Tr. B 26-27).

Sergeant Kohlmeier subsequently informed Burns that the premises had been secured.  (Tr. A 60).  According to Burns, Sergeant Kohlmeier also informed him that a marijuana "grow operation" was observed in two separate locations inside the residence during the course of the protective sweep.  (Tr. A 60, 145-46; D. Exs. L, M, N, O, P, Q).

Burns testified that he had received training in the identification of controlled substances.  (Tr. A 21-35).  In 1996 Burns completed a drug identification course relating to the recognition of marijuana, among other controlled substances.  (Tr. A 21-22).  In March 1999, Burns attended a five-day drug trafficking seminar.  (Tr. A 22-23).  Portions of that seminar involved identifying characteristics of marijuana trafficking, including identifying types of marijuana and how it is packaged, hid, stored and grown.  (Tr. A 24).  In 2000 Burns attended a seminar to train undercover officers in successful investigative work.  (Tr. A 24-25).  That seminar included information relating to marijuana trafficking, including how it is sold, distributed, packaged, hidden, transported and stored.  (Tr. A 25).

Burns estimated that in his experience as a police officer he had been involved in over 150 investigations involving marijuana trafficking.  (Tr. A 27).  He testified that he had observed raw marijuana approximately seventy-five times and had encountered burning marijuana approximately fifteen times.  (Tr. A 28).  Between August 1999 and January 2001, Burns worked as an undercover officer with a multi-agency drug task force.  (Tr. A 26).  According to Burns, in that capacity, he was personally involved in at least six investigations of marijuana trafficking that resulted in the seizure of marijuana.  (Tr. A 26-27).

11

Burns testified that he is familiar with the smell of raw marijuana and is able to distinguish the smell of burning marijuana from the smell of raw marijuana.  (Tr. A 29).  According to Burns, he understands the term "raw marijuana" to refer to marijuana in any form prior to burning or consumption.  (Tr. A 67).  Burns testified that he has expertise in smelling dried, but not undried, marijuana.  (Tr. A 129).  According to Burns, none of his training seminars involved the identification of undried, raw marijuana in plant form.  (Tr. A 74-77).  Burns testified that, prior to February 2011, he had been involved in two arrests involving non-dried marijuana in plant form.  (Tr. A 77-79).  In addition, Burns testified that he may have been present at the scene of approximately three investigations involving non-dried marijuana, but that he was not personally involved in those arrests.  (Tr. A 79-82).  WPD records reveal that no arrests for the sale or manufacture of marijuana occurred in 2009, one occurred in 2008 and in 2010, and two occurred in 2011.  (D. Exs. X and Y).


## II.    911 and Dispatch Recordings

The recordings of the 911 call placed by Carolyn Race and the dispatch transmissions relating to 203 Lake Road were introduced into evidence.  (D. Ex. D).  In the recording of the 911 call, a woman, who later identified herself as Carolyn Race, stated that "there seems to be a person that is kind of, um, disrupting things at 203 Lake Road[.]  I was wondering if you could check that and make sure it's ok over there."  The dispatcher asked Mrs. Race to explain what was going on at the location and whether it involved a disturbance or an argument.  Mrs. Race replied affirmatively, stating that she had recently spoken with her son and that it sounded like there was another person there "upsetting things" and she just wanted someone to check to ensure that everything was alright.  The dispatcher asked Mrs. Race

whether she knew if there were weapons involved or who was involved in the argument.  Mrs. Race replied that she thought the individual was named Adam Kuhn and that she was not present at the location, but her sons were.

In the dispatch recording, a voice can be heard indicating that it would take the "domestic" at 203 Lake Road.  Burns testified that the transmission related to the incident at 203 Lake Road on February 4, 2011.  (Tr. A 88).  Later in the recording, a voice can be heard stating "Call in to check the welfare on Five Mile across from the school near Publisher's Parkway for a female that is trying to get people to pull over and give her a ride, saying that her vehicle is being towed."  Burns responded to this transmission and indicated that he would respond to the call on Five Mile Line Road on his way to 203 Lake Road.  (Tr. A 89-90, D. Ex. D).

## III.   McCoy's Testimony

McCoy testified that he had been employed as an officer with WPD for approximately five years and had previously been employed by RPD for approximately three years.  (Tr. A 158-59).  McCoy's responsibilities at WPD included enforcing vehicle and traffic laws and responding to 911 calls.  (Tr. A 159).  McCoy was working the evening shift on February 4, 2011 and responded to Burns's request for backup at 203 Lake Road.  (Tr. A 160).

Prior to arriving at the scene, McCoy understood that there was a domestic violence call concerning the address, but he could not recall any other details.  (Tr. A 160, 166). McCoy also knew that Burns had already entered the premises at 203 Lake Road before he arrived.  (Tr. A 161, 170-71).  McCoy could not recall if he had overheard the 911 call.  (Tr. A 161, 166).  McCoy testified that he did not know whether he was aware prior to February 4, 2011 that Carolyn Race had made multiple calls regarding 203 Lake Road.  (Tr. A 168-69).  Although

WPD records indicated that McCoy had responded to the 203 Lake Road address in response to the call by Mrs. Race four days earlier, McCoy testified that he did not recall that incident. (Tr. A 166-67).

When McCoy arrived at the scene, he parked his vehicle on Lake Road and approached the premises on foot.  (Tr. A 161).  He testified that he entered the premises through the front door located at the northern corner of the property.  (*Id.*).  According to McCoy, the door was not locked, and he did not knock or announce his presence before entering the premises.  (*Id.*).

McCoy testified that the door led him into an enclosed porch and that he walked through another door and entered a living room area.  (Tr. A 162, 172-74).  As he approached the living room, McCoy noticed two male individuals to his left and Burns next to a table in the dining room area adjoining the kitchen.  (Tr. A 163, 174).  At that time, McCoy did not have his service weapon drawn, although he noticed that Burns had his drawn.  (Tr. A 163).  McCoy also noticed that Burns had detained a suspect.  (*Id.*).

According to McCoy, Burns indicated that the two male individuals should be detained.  (Tr. A 163, 174).  McCoy placed handcuffs on each of the individuals and conducted a pat frisk of their outer clothing for weapons.  (*Id.*).

IV.    **Cayward's Testimony**

Officer Brian Cayward ("Cayward") testified that he had been employed by WPD for approximately sixteen years and with other law enforcement departments for eight years before that.  (Tr. B 50-51).  According to Cayward, during the early morning hours of February 5, 2011, he became involved in an investigation involving Steven Race.  (*Id.*).  He reported to

WPD in order to interview Steven; before he did so, Burns told him that Burns had administered *Miranda* warnings to Steven.  (Tr. B 51, 53; 81-82).  Cayward was also informed that a marijuana grow operation had been discovered at 203 Lake Road.  (*Id.*).

At approximately 3:55 a.m., Cayward moved Steven from the holding cell into the booking room in order to interview him.  (Tr. B 52-54).  At the time, Steven was not handcuffed.  (Tr. B 54, 65).  Cayward and Steven sat in chairs next to a desk in the booking room and began talking.  (Tr. B 55).  Cayward did not administer *Miranda* warnings at that time. (Tr. B 83).  Cayward asked Steven questions relating to the investigation, and Steven answered Cayward's questions in a calm and cooperative manner.  (Tr. B 55-56, 65).

At approximately 4:26 a.m., Cayward issued *Miranda* warnings to Steven.  (Tr. B 59, 85).  According to Cayward, he reissued the warnings because he was aware that some jurisdictions require the reissuance of warnings after a lengthy break between the original *Miranda* warnings and subsequent questioning, and Cayward simply wanted to "make sure [he] was just dotting [his] I's and crossing [his] T's."  (Tr. B 59-60).  Cayward issued the warnings by reading them from a preprinted *Miranda* notification and waiver card.[9]  (Tr. B 60, 62-64, 83;

---

[9]  The Notification and Waiver Card provided:

1. You have a right to remain silent - you do not have to say anything if you don't want to.
2. Anything you do say can be used against you in a court of law.
3. You have a right to talk to a lawyer before answering any questions and have her/him here with you.
4. If you can't pay for a lawyer, one will be given to you before any questions if you wish.
5. If you do wish to talk with me, you can stop at any time.

(G. Ex. 2A).

G. Ex. 2A).[10]  After reading the warnings, Cayward read the two waiver questions verbatim from the card[11] and recorded Steven's affirmative answers on the card.  (Tr. B 64; G. Ex. 2A).

After administering the *Miranda* warnings, the interview continued.  (Tr. B 65).  According to Cayward, he asked Steven questions about the investigation that were more "pinpointed" and began to transcribe Steven's answers using a computer that was in the room.  (Tr. B 66, 73, 85).  According to Cayward, Steven was forthcoming with information, repeating some information that he previously had provided and offering some new information.  (Tr. B 67).  Cayward testified that he began typing the statement at 4:26 a.m. and completed it at 5:15 a.m.  (Tr. B 74, 85).

After he had completed typing Steven's responses, Cayward printed the responses on a form and provided it to Steven for his review.  (Tr. B 67, 74; G. Ex. 3).  According to Cayward, he asked Steven to review the entire statement and asked that he read the first line aloud.  (Tr. B 67, 74).  Cayward also instructed Steven that if he wanted to make any changes or deletions he should do so and place his initials next to any alterations.  (Tr. B 74).

Steven did not make any additions or deletions to the statement.  (Tr. B 75; G. Ex. 3).  Cayward instructed Steven that if everything in the statement were true, then Steven should sign the statement, and that Steven could face penalties if he signed a statement that contained false information.  (Tr. B 76).  According to Cayward, Steven acknowledged that the statement was accurate and signed the form.  (Tr. B 76; G. Ex. 3).

---

[10]  Two different exhibits were marked and received as Government's Exhibit 2.  To avoid confusion, the Court will refer to the exhibit that was received during the March 24, 2014 hearing as Government's Exhibit 2A.

[11]  The two waiver questions were:

    1.  Do you understand what I have just said to you?
    2.  Do you agree to talk with me now?

(G. Ex. 2A).

Cayward then escorted Steven outside so that Steven could smoke a cigarette and returned him to the holding cell.  (Tr. B 77).  According to Cayward, Steven never indicated that he did not wish to speak to Cayward, never asked for an attorney and never invoked his *Miranda* rights.  (Tr. B 56, 77).  Steven did not appear to be under the influence of drugs or alcohol, nor did he appear to be ill.  (Tr. B 56).  Cayward testified that he did not make any promises or threats or use any force in order to induce Steven to speak.  (Tr. B 58, 77-78).

## V.    <u>Doty's Testimony</u>

The defense elicited expert testimony from Richard L. Doty ("Doty"), PhD, during the hearing.  (Tr. C at 5).  Doty received his Bachelor's degree in psychology and biology from Colorado State University in 1966 and his Master's degree in experimental psychology and psychophysics from California State University in 1968.  (Tr. C 8; D. Ex. T).  Doty received his Doctoral degree in comparative psychology and zoology from Michigan State University in 1971.  (*Id.*).  Doty conducted postdoctoral work at the University of California at Berkeley and the University of Pennsylvania.  (*Id.*).  Since 1980, Doty has been the director of the Smell and Taste Center at the University of Pennsylvania, a center funded by the National Institutes of Health to research and evaluate the senses of taste and smell.  (Tr. C 7-8).  Doty participates in research, clinical work involving patients, and teaches classes.  (Tr. C 8-9).  Doty testified, without objection, as an expert on the human ability to smell.  (Tr. C 13).

In general terms, Doty testified that smells are carried in odor molecules that move through the air, enter the body through the nose and ultimately trigger signals to the brain, which interprets the odor.  (Tr. C 16-17, 40-42).  According to Doty, the ability to detect smells varies among individuals and may be affected by, among other things, gender, age and disease.

(Tr. C 14-15, 22).  Doty testified that the ability to smell a particular odor may be affected by environmental conditions, including temperature, humidity, wind and barriers, which affect the number of odor molecules to reach the nose.  (Tr. C 14, 18-19, 49-50).  For instance, according to Doty, higher humidity and colder temperatures make it more difficult to smell because there will be fewer odor molecules.  (*Id.*).  Wind may cause molecular dispersion, making it more difficult to smell, but wind also carries molecules, making it easier to detect a smell.  (Tr. C 49-51).  A barrier may limit the number of molecules that reach the nose.  (Tr. C 19).

Doty testified that he had conducted research about the detection of marijuana, which resulted in a published study.  (Tr. C 31; D. Ex. V).  According to Doty, he visited hemp farms and locations where medical marijuana was grown.  (Tr. C 31-32).  The study concluded that immature marijuana plants produce less odor than mature marijuana plants.  (Tr. C 33-34, 51-52).  According to Doty, one component of his research involved testing the ability of different human receptors to detect the odor of dried marijuana, which had been placed in a garbage bag in the trunk of a car, through the open window of the vehicle.  (Tr. C 35-36).  Doty testified that the study concluded that the marijuana could not be detected.  (Tr. C 36).  Based upon his research, Doty testified that undried marijuana has a somewhat stronger smell than dried marijuana.  (Tr. C 39).

Doty testified that he reviewed Burns's testimony about the entry into 203 Lake Road on February 4, 2011.  (Tr. C 20, 24-25).  Doty also reviewed a certified weather report reflecting the conditions at Rochester General Airport on February 4, 2011 and photographs depicting 203 Lake Road and the harvested marijuana and marijuana plants that were inside the premises.  (Tr. C 20, 25, 52-53; D. Ex. U).  Doty understood that there were 30 to 50 plants growing inside the residence.  (*Id.*).  Doty was also aware that approximately five plants were in

18

the process of being harvested on the table in the kitchen or dining area.  (*Id.*).  Doty opined that it was "highly unlikely" that an individual would have been able to detect the smell of undried, marijuana plant material from outside the house when the door was closed.  (Tr. C 23).  Doty likewise opined that that an individual would be "very unlikely" to be able to smell dried marijuana from outside of the house with the doors and the windows closed.  (Tr. C 23-24).

Doty testified that the circumstances confronting Burns, including the weather conditions, made it highly unlikely that Burns could have detected the odor of undried marijuana plant material when one of the doors to the premises at 203 Lake Road was opened.  (Tr. C 36-37, 54-55).  Doty conceded that it would be somewhat more likely than if none of the doors were opened, but he considered it highly unlikely that an overwhelming smell of marijuana could have been detected.  (Tr. C 54-55).  Although Doty testified that he considered the temperature, wind and humidity conditions from that evening, he concluded that the weather did not significantly affect his ultimate opinion, although he noted that the temperature made the odor molecules likely to disperse less.  (Tr. C 37-38).  In reaching his conclusions, Doty assumed that the windows to the house were closed.  (Tr. 61-62).  Doty did not make any specific assumptions concerning how long the plants had been located inside the premises.  (Tr. C 66).  Doty testified that the length of time that the marijuana plants had been inside the premises could affect the intensity of the marijuana odor.  (Tr. C 67).

## VI.    <u>Testimony of Reed</u>

Officer Mark Reed ("Reed") testified that he had been employed in WPD's patrol division for approximately five years and that his duties involved patrol, enforcement of vehicle and traffic laws and responding to dispatches.  (Tr. D 3).  Reed testified he had been previously

employed as a patrol officer for approximately three-and-one-half years by two different law enforcement agencies.  (Tr. D 3-4).

On February 6, 2011, beginning at approximately 7:43 p.m., Reed was involved in an investigation at 203 Lake Road in response to a dispatch call involving harassment.  (Tr. D 4-5).  On his way to the Lake Road residence, Reed was informed that there were signed criminal informations for Timothy Race in connection with a marijuana grow operation and firearms discovered at that location.  (Tr. D 5, 24, 27).  When he arrived at 203 Lake Road, Reed spoke with an individual in the driveway who identified himself as Timothy Race.  (Tr. D 22).  At that point, Reed arrested Timothy.  (Tr. D 5, 27-28).

Reed transported Timothy to WPD; Reed testified that he did not recall having any conversation with Timothy during the drive, which lasted approximately five minutes.  (Tr. D 6, 26).  When they arrived at WPD, Reed began to process Timothy, by entering information into the MORIS database, completing a prisoner data report and fingerprinting and photographing Timothy.  (Tr. D 6-7, 22, 28).  Reed escorted Timothy to an interview room and commenced an interview about the marijuana grow operation and firearms discovered at 203 Lake Road.  (Tr. D 5, 10, 14-15, 33).

Reed testified that he administered the *Miranda* warnings at approximately 8:01 p.m. by using a notification and waiver card.  (Tr. D 7, 9, 34-35; G. Ex. 1B).  According to Reed, he administered the warnings by reading the information verbatim from the back of the notification and waiver card.[12]  (Tr. D 12-13, 34-35).  Reed then asked Timothy the two waiver

---

[12]  The Notification and Waiver Card provided:

1. You have a right to remain silent - you do not have to say anything if you don't want to.
2. Anything you do say can be used against you in a court of law.
3. You have a right to talk to a lawyer before answering any questions and have her/him here with you.

questions contained on the notification and waiver card and recorded Timothy's affirmative answers on the card.[13]  (Tr. D 13-14, 36).  Timothy was not handcuffed at the time.  (Tr. D 10, 33-34).

>        At one point during the interview, Reed asked Timothy when the grow operation had started and how long it had been in place.  (Tr. D 16).  According to Reed, Timothy responded that he would not answer the question.  (*Id.*).  Reed then asked whether Timothy would provide a written statement, at which point Timothy requested an attorney.  (*Id.*).  At that point, according to Reed, approximately nineteen minutes had elapsed since he had informed Timothy of his *Miranda* rights.   (Tr. D 17, 38-39).  Reed continued to converse with Timothy after that point, but the government has represented that it will not seek to introduce any statements made by Timothy after he invoked his right to counsel.  (Tr. D 16-17).

>        According to Reed, Timothy appeared relaxed during the interview and had no apparent difficulty understanding him.   (Tr. D 17-18).  Reed testified that Timothy did not appear to be under the influence of drugs or alcohol.   (Tr. D 18).  In addition, Reed testified that he did not make any promises or threats or use any force to induce Timothy to speak to him. (*Id.*).

---

>    4.  If you can't pay for a lawyer, one will be given to you before any questions if you wish.
>    5.  If you do wish to talk with me, you can stop at any time.

(G. Ex. 1B).

>    [13]  The two waiver questions were:

>        1.  Do you understand what I have just said to you?
>        2.  Do you agree to talk with me now?

(G. Ex. 1B).

**VII.**   **Search Warrant Application for 203 Lake Road**

On February 5, 2011, Burns submitted an affidavit in support of an application for a warrant to search 203 Lake Road and two vehicles in the driveway of that location.  (Docket # 97-1 at 2-8).  In the affidavit, Burns recounted his experience as a police officer, particularly with respect to his investigations of narcotics trafficking.  (*Id.* at 4).  In relevant part, Burns indicated that he had been assigned to a multi-agency drug task force from August 1999 through January 2001.  (*Id.*).  Burns stated that he had observed "numerous outdoor and indoor growing of marijuana operations [and] ha[d] arrested those who are involved in this type of illegal activity."  (*Id.*).  Burns listed seven different training courses that he attended between 1995 and 2009, which he attested were directly related to criminal and narcotics investigations.  (*Id.* at 5).

The affidavit described the events that transpired at 203 Lake Road on February 4, 2011.  (*Id.* at 5-6).  According to the affidavit, Burns was dispatched to the premises to investigate a reported call of an "in progress domestic violence" incident and had been informed that there was an argument going on inside of the location.  (*Id.*).  Burns stated that prior to knocking on the door, he heard individuals inside the premises and that he smelled a strong odor of marijuana emanating from the house.  (*Id.*).  Burns further stated that he knocked on the door and announced, "Police Department" and then heard running footsteps inside.  (*Id.*).

According to Burns, he rang the doorbell, and a male answered the door.  (*Id.*).  At that point, Burns stated, he smelled the same strong odor of marijuana.  (*Id.*).  Burns informed the male that he was there to investigate a domestic violence call, and the male informed him that there was nothing going on.  (*Id.*).  Burns then identified the caller and asked the male who was inside the premises.  (*Id.*)  According to Burns, the male responded that no one else was in the

22

home. (*Id.*). The male also told Burns that it was his mother who had called and that her call constituted harassment. (*Id.*).

Burns stated that he asked the male, later identified as Steven Race, if he could come inside and talk to the occupants. (*Id.*). According to the affidavit, Steven again told him that there was no one in the house. (*Id.*). According to Burns, based upon his training and experience, he believed that people were inside the premises and became concerned for his safety, and he immediately placed handcuffs on Steven. (*Id.*). Burns entered the premises with his gun drawn and observed marijuana plants on the kitchen table. (*Id.*). According to the affidavit, he also saw McCoy detaining two male individuals in the living room. (*Id.*). In the living room, Burns observed marijuana buds that had been cultivated and were drying. (*Id.*).

After the individuals were detained, Burns stated that a protective sweep of the premises was conducted. (*Id.*). During the sweep, according to the affidavit, no victims of domestic violence were discovered, although a marijuana grow operation was observed in the basement and the second story bedroom. (*Id.*). Also discovered in plain view was a Bushmaster rifle case, a firearm scope and a firearm cleaning kit. (*Id.*).

During his testimony, Burns conceded that there were several factual errors in his affidavit. (Tr. A 69). For instance, according to Burns, the dates that he attended several of the training courses were inaccurate in the affidavit. (Tr. A 33-34). Burns testified that he relied on his memory in reconstructing the timeline of his training courses and did not confirm the actual dates when preparing the affidavit. (*Id.*). According to Burns, his affidavit incorrectly identified the 911 call number as 2671-10 instead of 2673-10. (Tr. A 70; D. Ex. A). In addition, Burns testified that the affidavit incorrectly stated that he announced "Police Department" when he

knocked on the door, although he did not do so until he rang the doorbell.  (Tr. A 71-72; D. Ex. A).

Burns also testified that none of the training courses identified in the affidavit related to undried marijuana.  (Tr. A 74-77; D. Ex. A).  He also testified that he did not include in the affidavit any information about Carolyn Race's prior 911 calls relating to 203 Lake Road, nor did he clarify that his experience with marijuana related to dried marijuana rather than marijuana grow operations.  (Tr. A 148-49).

## VIII.   **Steven Race's Affidavit**

In support of his suppression motion, Steven submitted an affidavit stating that he had an expectation of privacy in the premises located at 203 Lake Road, Rochester, New York and that he did not give law enforcement permission to enter or search the residence.  (Docket # 76 at ¶¶ 2-3).  In a separate affidavit, Steven asserted that he was arrested and interrogated on February 4, 2011, but was not read his *Miranda* rights.  (Docket # 97-1 at 13, ¶¶ 2-3).

## IX.   **Timothy Race's Affidavit**

In support of his suppression motion, Timothy submitted an affidavit stating that he had an expectation of privacy in the premises located at 203 Lake Road, Rochester, New York and that he did not give law enforcement permission to enter or search the residence.  (Docket # 113 at ¶¶ 2-3).  Timothy also asserted that he was arrested and interrogated on February 6, 2011 and that during the interrogation he told Reed[14] that he no longer wished to be questioned and wanted an attorney.  (Docket # 113 at ¶ 4).  According to Timothy, Reed continued to interrogate him.  (*Id.*).

---

[14]   In the affidavit, Reed is incorrectly spelled "Reid."

## REPORT & RECOMMENDATION

### I.    Entry into 203 Lake Road

Both defendants seek suppression of evidence seized from 203 Lake Road on the grounds that Burns unlawfully entered the premises without a warrant and without exigent circumstances to justify his entry.[15]  (Docket # 123 at 14-19).  The government opposes the motion, contending that Burns's entry was justified on two independent bases.  (Docket # 126 at 15-19).  First, the government maintains that Burns was justified in entering the premises in order to determine whether anyone in the residence needed his assistance.  (*Id.* at 17-18). Second, the government maintains that Burns lawfully entered the premises based upon his objectively reasonable belief that someone inside was destroying evidence of a crime.  (*Id.* at 18-19).

### A.    Investigation of the 911 Call

The government's first justification – that Burns was entitled to enter the home in order to investigate the 911 call – implicates the emergency aid doctrine, a subset of the exigent circumstances doctrine.  *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403-04 (2006); *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir.), *cert. denied*, 135 S. Ct. 478 (2014). The emergency aid exception to the warrant requirement permits "law enforcement officers '[to] enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'"  *See Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. at 403); *see also Montanez v. Sharoh*, 444 F. App'x 484, 486 (2d Cir. 2011) ("[p]olice officers may enter a dwelling without a warrant to

---

[15]  Timothy requested and was granted leave to join in the suppression motion filed by Steven.  (Docket # 110).

render emergency aid and assistance to a person whom they reasonably believe to be in distress

and in need of that assistance") (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)).

As the Seventh Circuit recently explained:

> [The] emergency aid doctrine . . . recognizes that a warrantless
> entry into the home may be appropriate when police enter for an
> urgent purpose other than to arrest a suspect or to look for evidence
> of a crime. . . . [T]his doctrine recognizes that police play a service
> and protective role in addition to a law enforcement role. . . .
> [P]olice officers may sometimes need to enter a dwelling in order
> to render aid to an occupant whom they believe to be in distress
> and in immediate need of their assistance.

*Sutterfield v. City of Milwaukee*, 751 F.3d at 557-58 (citations omitted).  The test to determine

the applicability of the emergency aid doctrine is an objective one, *see Michigan v. Fisher*, 558

U.S. at 47; *Brigham City*, 547 U.S. at 404, and inquires "whether the police, given the facts

confronting them, reasonably believed that it was necessary to enter a home in order to render

assistance or prevent harm to persons or property within."  *Sutterfield*, 751 F.3d at 558 (internal

quotation omitted).

The defining characteristic of the emergency aid doctrine, just like the exigent

circumstances doctrine, is a "time-urgent need to act."  *Sutterfield*, 751 F.3d at 559-60; *accord*

*Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003) ("[t]he essential question in

determining whether exigent circumstances justified a warrantless entry is whether law

enforcement agents were confronted by an 'urgent need' to render aid or take action"); *United*

*States v. Paige*, 493 F. Supp. 2d 641, 647 (W.D.N.Y. 2007).  Stated another way, "[i]t may be,

then, that probable cause in the emergency aid context is not reason to believe a crime is

occurring or has been committed, but reason to believe that someone is in need of aid and there

is a compelling need to act."  *Id.; see also Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 169

(2d Cir. 2002) ("probable cause for a forced entry in response to exigent circumstances requires

finding probability that a person is in danger") (internal quotations omitted); *United States v. Timmann*, 741 F.3d 1170, 1178 n.4 (11th Cir. 2013) ("in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger"); *United States v. Infante*, 701 F.3d 386, 392-93 (1st Cir. 2012) ("the burden is on the government to show a reasonable basis, approximating probable cause, both for the government official's belief in the existence of an emergency and for associating the perceived emergency with the area or place to be searched"), *cert. denied*, 133 S. Ct. 2841 (2013).

Thus, the critical considerations are whether the police reasonably believed that entry into a home was necessary to render assistance or prevent harm to someone in the home and whether they acted in an "expeditious, if not immediate" manner consistent with the professed urgency. *Sutterfield*, 751 F.3d at 563; *see also United States v. Kenfield*, 270 F. App'x 695, 696 (9th Cir.) (emergency aid doctrine also requires consideration of the reasonableness of the search's scope and manner to meet the emergency need), *cert. denied*, 555 U.S. 868 (2008). "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Fisher*, 558 U.S. at 49 (internal quotations omitted). Of course, as in all Fourth Amendment inquiries, the touchstone is reasonableness. *Id.* at 47.

"Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances" so long as "the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Tierney v. Davidson*, 133 F.3d at 197. That said, no *per se* rule exists authorizing an officer to make a warrantless entry into a premises whenever he or she responds to an incident that allegedly involves domestic violence. *See United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002) (refusing to adopt "a special rule for domestic calls

because they are inherently violent, and the police, responding to these calls, are automatically at greater risk"); *Williams v. Cnty. of Alameda*, 26 F. Supp. 3d 925, 938-39 (N.D. Cal. 2014) ("[w]hile the Ninth Circuit has recognized that domestic violence cases present a unique set of dangers that may, at times, 'override consideration of privacy,' such cases do not create a *per se* exigent need for a warrantless entry; rather, the totality of the circumstances must be considered to determine whether exigent circumstances relieved the officers of the customary need for a warrant prior to entry").  Instead, "the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time."  *Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  In assessing the totality of the circumstances confronting the officer, all facts within the knowledge of the responding officers should be taken into account.  *United States v. Davis*, 290 F.3d at 1243 ("this court gives substantial weight to police knowledge, or lack thereof, of a defendant's history prior to the incident under inquiry").

In this case, the record demonstrates that law enforcement did not act immediately to respond to the 911 call at 203 Lake Road.  Although the record reveals that Burns arrived at 203 Lake Road within approximately five minutes of the 911 call, he responded to another call first.  While the investigation of the other report (a woman attempting to hitchhike on Five Mile Line Road) did not result in substantial delay in Burns's arrival at 203 Lake Road, the fact that Burns first responded to the hitchhiking complaint undercuts to some degree any argument that the officer believed the 203 Lake Road report required an immediate response.  Moreover, the fact that Burns did not activate his sirens or lights during the drive to Lake Road also suggests that the officers did not consider the call an emergency.

Nor does the record establish an objectively reasonable basis upon which to conclude that Burns's warrantless entry of 203 Lake Road was justified by a need to render emergency aid or assistance to occupants inside.  As an initial matter, although Burns testified that he considered the 911 call to be a "domestic violence" incident, the record does not support his conclusion.  *See United States v. Sikut*, 488 F. Supp. 2d 291, 307-08 (W.D.N.Y. 2007) ("the information provided by the 911 caller in the instant case was not unambiguously indicative of a recent domestic dispute involving personal violence"); *Fernandez v. Sacco*, 2012 WL 6102136, *6 (E.D.N.Y. 2012) (caller "described the general sounds of an altercation but [was] nonspecific and could not be corroborated by the responding officers' observations").  The 911 call from Mrs. Race, which Burns overheard in his police vehicle, was remarkably vague and suggested that a "disrupt[ion]" of some kind might have been occurring at the residence.  Mrs. Race's report contained no information [from] which a reasonable officer could deduce the circumstances present at the location.  Indeed, when the dispatcher asked her for further detail, Mrs. Race merely repeated her vague allegations of an individual "upsetting things."  Her report did not include specific allegations of a physical or violent confrontation or injuries to anyone in the house.  Moreover, as Mrs. Race informed the dispatcher, she was not calling from the residence implicated.  *See Fernandez v. Sacco*, 2012 WL 6102136 at *6 ("the information relayed to the police officers in the instant case was not from the alleged victim, nor from a person within the potential victim's residence") (internal quotations omitted).

Most importantly, although reliance on a 911 call by an identified caller to report an altercation will likely be reasonable under certain circumstances, the facts confronting Burns are not those circumstances.  The record establishes that Mrs. Race had previously called 911 six times prior to February 4, 2011 concerning 203 Lake Road and that the majority of those calls

were determined to be unsubstantiated.  Although Burns had not personally responded to any of

those earlier calls, he knew that Mrs. Race had made 911 calls in the past, some of which had

been unsubstantiated.  Indeed, Burns himself characterized Mrs. Race as "less than stable with

respect to the calls that she made."  (Tr. A 156-57).  *See United States v. Sikut*, 488 F. Supp. 2d

at 310 ("prior to arrival at the scene . . . [the officers] had substantial reason to doubt there was a

need to effect an emergency entry into [the] apartment based on [one of the officers'] familiarity

with prior 911 call regarding noises  . . . [from the apartment], and the call's lack of substance").

       Burns testified that WPD policy required him to respond and investigate the 911

call irrespective of Mrs. Race's history of unsubstantiated calls.  I do not disagree; responding

and investigating was appropriate and prudent.  However, WPD policy does not and cannot

confer authority to the police to dispense with the warrant requirement every time the police

receive a report of an altercation inside a home, especially where the report is made by a person

known to the police to be unreliable.  The reliability or unreliability of the caller is part of the

totality of the circumstances that must be assessed by the responding officer.  *See Davis*, 290

F.3d at 1243-44 (holding that "granting unfettered permission to officers to enter homes, based

only upon a general assumption [that] domestic calls are *always* dangerous, would violate the

Fourth Amendment") (internal quotations omitted); *United States v. Stewart*, 867 F.2d 581, 584

(10th Cir. 1989) ("[t]he reasonableness of the officers' conduct hinges on the facts within their

knowledge indicating exigency").

       Finally, Burns's observations and pre-entry investigation failed to support the

report of a "disrupt[ion]."  *See Kerman v. City of New York*, 261 F.3d at 236 (warrantless entry

based upon anonymous 911 call unlawful where officers did not conduct any investigation to

confirm the call; "[b]ased on the absence of evidence in the record to corroborate the 911 call

and the protections afforded to private dwellings under the Fourth Amendment, we find the

officer's warrantless entry into [the plaintiff's] apartment violated the Fourth Amendment");

*Williams v. Cnty. of Alameda*, 26 F. Supp. 3d at 934, 938 (defendants failed to demonstrate an

objectively reasonable basis to enter the house without a warrant where plaintiff "displayed no

physical signs of an altercation, and the home showed no indication of a disturbance"; "[o]ther

than the 911 call from a young boy alerting police to a potential for domestic abuse, and the

failure of the boy to answer a return phone call . . . , there are no facts . . . creating an exigency

justifying entry into [p]laintiff's residence without a warrant"); *United States v. Bridges*, 2008

WL 2433881, *7-8 (N.D. W. Va. 2008) ("the officers here observed nothing out of the ordinary

before they entered [defendant's] home[;] . . . [t]here was no one hurt, crying or otherwise in

danger[;] . . . [c]onsequently, no exigent circumstance existed"); *Sikut*, 488 F. Supp. 2d at 309

("it is undisputed that the officers detected nothing during their further investigation at the

apartment . . . to suggest there was any substance to the present 911 call").  Burns did not testify

that he observed any damage to the premises or any other sign of an altercation.  Moreover, the

voices that Burns testified that he heard were conversational, not agitated.  He did not testify that

there was anything about Steven's appearance that suggested that he had been involved in a

physical confrontation.  Steven did not appear to be under the influence of drugs or alcohol, and

he explained that Carolyn Race was his mother and that her phone call was part of ongoing

harassment.  Finally, the fact that Burns allowed a high school student to approach and enter the

premises seems inconsistent with a reasonable belief that a violent confrontation had occurred or

was ongoing inside the premises.  *See Sikut*, 488 F. Supp. 2d at 311 ("the officers' other actions

at the scene do not reflect a reasonable belief that exigent circumstances were then present and

required immediate entry of the apartment").

The only circumstances that could be seen as suspicious were the sound of running feet and Steven's false denial that anyone else was present inside.  As discussed in the next section, plausible non-criminal explanations could exist for both circumstances, especially considering the near-midnight arrival time of Burns and the fact that someone inside evidently possessed marijuana.  (*See infra* at 39-40).

In determining whether Burns's entry into the premises was justified under the emergency aid doctrine, I recognize both the inherently volatile nature of domestic violence incidents, and the deference that is generally owed to law enforcement officers entrusted with the difficult responsibility of making quick, but critical decisions based upon fluid and evolving circumstances.  Emergency calls often play an important role in protecting public safety, and the fact that a caller had previously been determined to have placed an unfounded call does not relieve law enforcement of the responsibility to evaluate the call and respond appropriately under the circumstances; those circumstances may include exigencies that justify a warrantless intrusion into private property.  *See*, *e.g.*, *United States v. Richardson*, 208 F.3d 626, 631 (7th Cir.) ("[w]hile we do not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, because of additional information available to the officer, this is not that case"), *cert. denied*, 531 U.S. 910 (2000).

In this case, however, where the totality of the circumstances confronting Burns included only a vague report made by a known caller with a history of unreliable reports about a disruption inside her son's residence, uncorroborated by observations or other evidence at the scene consistent with an altercation, I conclude that the government has failed to establish that Burns's entry was justified by the emergency aid doctrine.  *See Davis*, 290 F.3d at 1243-44 (officers had no objectively reasonable basis to find exigency based upon totality of

circumstances); *Kerman v. City of New York*, 261 F.3d at 236 (warrantless entry into home was not justified by exigent circumstances where officers responded to domestic 911 call and failed to corroborate the call prior to entering the home); *Sikut*, 488 F. Supp. 2d at 308 ("where, as here, the officer had acknowledged reasons for doubting the accuracy of the caller's perception of danger without independent evidence of such danger, deference is [un]warranted[;] . . . based on [the officer's] awareness of the prior domestic call regarding the . . . residence, which failed to show any need for police assistance and the absence of independent evidence directly corroborating the present caller's complaint, it was not objectively reasonable to conclude that the 911 caller was sufficiently reliable to demonstrate that exigent circumstances were present"). "While courts should generally be reluctant to second-guess good faith decisions by police intended to protect life and limb, nevertheless, based on the totality of the circumstances presented on this record, it was not objectively reasonable for" Burns to enter 203 Lake Road without a warrant in the belief that someone inside required emergency aid or assistance. *Sikut*, 488 F. Supp. 2d at 312.

### B.  Destruction of Evidence

As a general matter, although warrantless searches and seizures inside a home are presumptively unreasonable, the "presumption may be overcome in some [exigent] circumstances because '[t]he ultimate touchstone of the Fourth Amendment is reasonableness.'" *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Brigham City*, 547 U.S. at 403).  One such exigency that may justify a warrantless entry into the home is the need "to prevent the imminent destruction of evidence."  *Id.* (internal quotations omitted).  The government bears a "heavy burden" in attempting to establish that an exigent need justified a warrantless entry. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

In evaluating whether exigent circumstances exist, the court should consider the totality of the circumstances, including, where applicable:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect 'is reasonably believed to be armed'; (3) 'a clear showing of probable cause … to believe that the suspect committed the crime'; (4) 'strong reason to believe that the suspect is in the premises being entered'; (5) 'a likelihood that the suspect will escape if not swiftly apprehended'; and (6) the peaceful circumstances of the entry.

*United States v. MacDonald*, 916 F.2d 766, 769-70 (2d Cir. 1990) (adopting the factors set forth in *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970)).  The list of factors is not exhaustive and the presence or absence of any single factor is not dispositive.  *Id.*  Further, the factors "are not germane in every exigent circumstances situation, . . . [and] [s]ometimes the presence of a solitary factor [like the destruction of evidence] suffices."  *United States v. Andino*, 768 F.3d 94, 99 (2d Cir. 2014) (internal quotations and citations omitted).  "The gravity of the underlying offense" is an important factor.  *Welsh v. Wisconsin*, 466 U.S. at 753; *see Loria v. Gorman*, 306 F.3d 1271, 1285 (2d Cir. 2002) ("[t]he first factor – the gravity or violent nature of the offense – weighs heavily in the determination of whether exigent circumstances exist").

The government argues that Burns was justified in entering 203 Lake Road without a warrant in order to prevent the destruction of evidence of marijuana manufacturing. (Docket # 126 at 18-19).  The government contends that the smell of marijuana, coupled with the sound of running feet, constitutes reasonable grounds for believing that evidence of a marijuana grow operation was being destroyed.  (*Id.*).  I disagree.

Crediting Burns's testimony that he smelled raw marijuana, that testimony is nonetheless insufficient to give rise to a reasonable inference that a grow operation was present inside.  Burns simply testified that he smelled "raw marijuana," which he defined to include

34

dried, as well as live marijuana material.  Burns did not testify that the nature or potency of the

smell of the "raw marijuana" caused him to believe that marijuana plants or quantities in excess

of a non-criminal amount of dried marijuana were present inside the house.[16]  Although Burns

testified that after Steven opened the door, the smell of the marijuana was "overwhelming," he

never testified that the strength of the smell itself had evidentiary value beyond its indication that

some marijuana was inside the home.  Further, nothing in the record suggests Burns or any other

officers involved in the investigation had reason to suspect that 203 Lake Road or its occupants

were involved in marijuana manufacturing or trafficking.

       In other words, I find that the smell of marijuana gave rise to the reasonable belief

that some quantity of marijuana was inside the house.  *See United States v. Mongold*, 528

F. App'x 944, 951 (10th Cir. 2013) (complaints of suspicious traffic at house, occupant's known

drug history, and the smell of marijuana, coupled with "scurrying" sounds upon law

enforcement's arrival at residence, were "sufficient to establish probable cause that a crime –

possession of marijuana – was being committed, but there was not sufficient evidence to

establish probable cause for drug trafficking"); *United States v. Fareed*, 2001 WL 1432285, *4

(W.D.N.Y. 2001) ("[t]he police had no information whatsoever upon which to believe that any

quantity of marijuana more than 25 grams was present in the apartment").  "In New York State,

the possession and use of marijuana (not in public), with an aggregate weight of less than 25

grams, has been decriminalized" and is punishable by a fine.  *United States v. Fareed*, 2001 WL

1432285 at *4 (citing N.Y. Penal Law §§ 221.05 and 221.10).  Several courts have held that the

suspected destruction of evidence of a minor crime or violation punishable by a fine, particularly

---

[16]  Under New York Law, possession of marijuana in quantities less than or equal to twenty-five grams within a private residence is an offense but not a crime.  *See* N.Y. Penal Law §§ 10.00(1), (6); 221.05.  Possession of marijuana in a public place or in quantities in excess of twenty-five grams is a misdemeanor.  N.Y. Penal Law § 221.10.  The unlicensed growth of marijuana is a misdemeanor.  N.Y. Pub. Health Law § 3382.

possession of marijuana, is insufficient to justify a warrantless entry into a residence. *See*, *e.g.*, *Welsh*, 466 U.S. at 754 ("[t]he [s]tate . . . has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no prison is possible[;] . . . [g]iven this expression of the [s]tate's interest, a warrantless [home entry] cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the police obtained a warrant"); *United States v. Mongold*, 528 F. App'x at 949 ("if marijuana possession is the only crime for which the officers in this case had probable cause, the exigency exception for destruction of evidence should not apply because marijuana possession is not a serious crime"); *White v. Stanley*, 745 F.3d 237, 241 (7th Cir. 2014) ("[t]he possession of a small amount of marijuana is far from that rare case[;] . . . police who simply smell burning marijuana generally face no exigency and must get a warrant to enter the home"); *United States v. Shook*, 2013 WL 2354085, *3 (D. Idaho 2013) ("[s]melling marijuana signals only that someone is smoking pot, a minor misdemeanor that cannot justify a warrantless home entry"); *Fareed*, 2001 WL 1432285 at *4 ("[t]he government has not presented any authority which would justify the forcible warrantless entry into an individual's home based upon [possession of marijuana,] conduct that amounted only to a non-criminal violation"); *Polson v. City of Lee's Summit*, 535 F. Supp. 555, 569 (W.D. Miss. 1982) ("[i]t would seem that Fourth Amendment privacy interests have been given priority over the law enforcement interest in rooting out, arresting and punishing marijuana smokers[;] [i]n any event, the cases do not allow the odor of burning marijuana to serve in place of a search warrant").

        In any event, even assuming the applicability of the exigent circumstances doctrine to the suspected destruction of evidence of marijuana possession, I find that the facts upon which Burns purportedly relied were too speculative to justify his warrantless entry. As an

initial matter, I note that several courts have held that the smell of controlled substances,

including marijuana, alone is not an exigency that justifies a warrantless entry into a premises.[17]

*See Johnson v. United States*, 333 U.S. 10, 14 (1948) (smell of opium insufficient, without more,

to justify warrantless entry into apartment); *Fareed*, 2001 WL 1432285 at *4 ("[m]ere

speculation is not sufficient to show exigent circumstances; . . . [t]he government has failed to

offer any evidence which would support the claim that if the officers had simply left the

apartment and gone to obtain a warrant (assuming a warrant would have been issued based upon

the information possessed by the officers), that the marijuana . . . would have been destroyed in

the interim"); *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1075 (S.D. Tx. 2000) ("the court

is not persuaded by the [c]ity's argument that the smell of burning narcotics establishes both the

---

[17]   Some courts have found exigent circumstances where law enforcement smelled marijuana outside the premises.  The majority of those cases are distinguishable, however, on the grounds that law enforcement had some reason to believe that the premises contained substantial amounts of narcotics or evidence of marijuana sales or trafficking because either the premises or its occupants were under investigation for ongoing drug activity.  *See United States v. Ashbourne*, 571 F. App'x 422, 424 (6th Cir. 2014) (officers had information that apartment contained a large volume of marijuana and were at the location in order to conduct a controlled delivery); *United States v. Albarado*, 555 F. App'x 353, 356 (5th Cir. 2014) ("[b]efore they knocked, the agents had received a tip that the residence was a marijuana stash house for the Mexican Mafia"); *United States v. Reed*, 318 F. App'x 774, 776 (11th Cir. 2009) ("officers had probable cause to enter the residence after they spied the nearby marijuana field and smelled marijuana emanating from the rear window"); *United States v. Floyd*, 247 F. App'x 161, 166-67 (11th Cir. 2007) ("officers approached [defendant's] house armed with an arrest warrant that they believed was valid and information that [defendant] was a drug dealer), *cert. denied*, 552 U.S. 1158 (2008); *United States v. Carter*, 315 F.3d 651, 653 (6th Cir. 2003) (law enforcement entered hotel room occupied by individuals suspected of conducting a narcotics transaction), *reh'g en banc*, 378 F.3d 584 (6th Cir. 2004), *cert. denied*, 543 U.S. 1155 (2005); *United States v. Tobin*, 923 F.2d 1506, 1508 (11th Cir. 1991) (law enforcement was conducting surveillance of location and observed bags they believed to contain cocaine placed within garage of location); *United States v. Staley*, 2013 WL 1405349, *1 (M.D. Ala.) (law enforcement investigating complaint that marijuana was consumed in front of minors in the apartment), *report and recommendation adopted*, 2013 WL 1405340 (M.D. Ala. 2013); *Feliciano v. City of Miami Beach*, 847 F. Supp. 2d 1359, 1361 (S.D. Fla. 2012) (law enforcement "received a confidential tip from [p]laintiff's neighbor that drug activity was taking place in [p]laintiff's home"); *United States v. Jefferson*, 2008 WL 1848798, *1, 4 (M.D. Ala. 2008) (officers were investigating information that individual had recently purchased marijuana from individual in the trailer); *United States v. Renteria-Lopez*, 2011 WL 3880899, *1 (D. Kan. 2011) (law enforcement suspected defendant was trafficking large quantities of methamphetamine); *United States v. Smalls*, 617 F. Supp. 2d 1240, 1246 (S.D. Fla. 2008) (law enforcement was investigating a tip that narcotics were being sold from the residence), *aff'd*, 342 F. App'x 505 (11th Cir. 2009), *cert. denied*, 558 U.S. 1128 (2010); *United States v. Murat*, 2008 WL 4394788, *3 (S.D. Fla. 2008) (law enforcement was investigating tip that apartment was involved in narcotics sales).  *But see United States v. McMillion*, 472 F. App'x 138, 140-41 (3d Cir.) (officers conducting routine patrol of high crime area smelled marijuana emanating from apartment), *cert. denied*, 133 S. Ct. 354 (2012); *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir.) (law enforcement responding to report of an individual with a gun smelled marijuana emanating from hotel room), *cert. denied*, 500 U.S. 945 (1991).

probable cause and the exigent circumstances needed to justify the warrantless entry and search of a private residence"), *aff'd*, 291 F.3d 325 (5th Cir. 2002), *cert. denied*, 537 U.S. 1110 (2003); *Polson v. City of Lee's Summit*, 535 F. Supp. at 559 ("no authority has been cited to establish that the odor of marijuana smoke provide both probable cause and exigent circumstances . . . for a warrantless search").

In addition to the smell of marijuana, Burns testified that he heard the sound of running feet after announcing "Police Department" and suspected that Steven was lying to him about the presence of others in the house. Although the sound of running feet, in combination with other evidence, may suggest the destruction of evidence, *see United States v. Ramirez-Martinez*, 2010 WL 4973704, *7 (E.D. Wis.) ("once at a door, additional facts may develop, such as an unreasonable delay in known occupants answering a door or the sound of feet running throughout the house, so that when combined with facts previously known to the officers, such as the nature of the investigation, exigent circumstances will develop to justify a warrantless entry into a residence"), *report and recommendation adopted*, 2010 WL 4968248 (E.D. Wis. 2010), several courts have held that the sound of running feet, without more, does not create an exigency, *see United States v. Williams*, 604 F.2d 1102, 1122-23 (8th Cir. 1979) ("virtually the only factors indicative of exigency in the present case are the subject matter of the investigation, that is, narcotics, . . . and the officers' testimony about hearing the sound of "running feet"[;] . . . [t]here was no showing that the facts involved compelling need for official action and no time to secure a warrant . . . [and] we would be reluctant to find exigent circumstances, on the basis of 'running feet' sounds, especially when the police precipitated such an action, and in the absence of any indication that the suspect will likely escape, knows of the presence of the police, or is reasonably believed to be armed and thus present a danger to the

safety of the investigating officers") (internal quotations omitted); *United States v. Radford*, 106 F. Supp. 2d 944, 950 (E.D. Mich. 2000) ("[t]he case law is clear that 'running footsteps,' in and of themselves, do *not* qualify as 'exigent circumstances').

The Court recognizes that the provision of false information to law enforcement is a fact that may contribute to an officer's assessment of exigency or probable cause. *See, e.g.*, *Pinkney v. Keane*, 920 F.2d 1090 (2d Cir. 1990) ("[defendant's] evasive and false responses to [officer] . . . , coupled with the officer's specific knowledge that a felony had just been committed . . . , argue strongly for a finding of probable cause"), *cert. denied*, 501 U.S. 1217 (1991); *United States v. McConnell*, 903 F.2d 566, 5569 (8th Cir. 1990) (several factors, including that defendant had lied to officers about the presence of other persons in the room, created several reasonable concerns including "whether [defendant's] lies about the presence of other persons in the hotel room was an attempt to prepare to take some action against the officer, or hotel guests"), *cert. denied*, 499 U.S. 938 (1991).  Similarly, although a person's willingness to lie to law enforcement may suggest a willingness to destroy evidence, *see Mears v. McCulley*, 881 F. Supp. 2d 1305, 1331 (N.D. Ala. 2012) ("[plaintiff's girlfriend] was initially untruthful when telling [officer] that plaintiff was not home[,] [and] [i]t would be reasonable to assume that, if she was willing to lie to the police about plaintiff's whereabouts, she also would be willing to hide, remove or destroy evidence on his behalf"), an untruthful statement to a law enforcement officer does not necessarily justify a warrantless entry.  *See Davis*, 290 F.3d at 1243 ("[i]t is true [defendant] lied about [his wife's] whereabouts, but any concern that lie might have effected was allayed when she appeared without any signs of harm").

The question presented in this case is whether these facts – the smell of marijuana, the sound of running feet in response to Burns's announcement and Steven's

dishonest answer that he was alone – taken together demonstrate exigent circumstances.  In my estimation, the question is a close one.  After careful consideration and evaluation of relevant caselaw, I conclude that the facts confronting Burns were insufficient to demonstrate an exigency justifying entry into 203 Lake Road.  When Burns responded to 203 Lake Road, it was almost midnight.  He had a 911 call from an unreliable caller about a possible "disrupt[ion]" at the premises.  He had no information or even a tip about drug activity at the premises.  The fact that the announcement of police presence seemingly prompted someone inside to retreat quickly could be explained by a variety of non-criminal reasons (an intimate tryst, immodest nightwear, *e.g.*).  Some of those same reasons could explain a dishonest response to law enforcement that no one else was present in the premises.  In addition, both acts could be explained by the occupant's desire to keep the police from learning about their possession of non-criminal quantities of marijuana.  Coupled with the non-serious nature of the suspected activity (marijuana possession), the lack of information to suggest that the premises was associated with marijuana manufacturing or trafficking, and the fairly limited investigation at the scene, the facts are insufficient to justify Burns's warrantless entry into 203 Lake Road under the exigent circumstances doctrine.[18]

---

[18]  Burns's suspicion that individuals inside the house may have had firearms is likewise too speculative to justify his warrantless entry.  *Mongold*, 528 F. App'x at 951-52 ("[t]he [g]overnment presented no evidence that the officers had reasonable grounds to believe that there [was] immediate need to protect their lives or others[;] . . . [b]efore entering the home, the officers had not seen a weapon or any other indication of heightened danger") (internal quotations omitted); *United States v. Menchaca-Castruita*, 587 F.3d 283, 295 (5th Cir. 2009) ("[t]he government would have us affirm the district court's finding of exigent circumstances because (1) the officer reasonably believed that there were drugs in the home; (2) there was at least a possibility that someone else might be inside; and (3) firearms are often the 'tools of the trade' for drug traffickers[;] [b]ut, inasmuch as these circumstances will be present in virtually every case involving a residence suspected of containing drugs, it bears emphasis that the exigent-circumstances exception is just that – an exception[;] . . . [h]ere, the totality of the circumstances falls well short of any reasonable foundation for such speculation").

II.   **Suppression Under *Wong Sun***

Having concluded that Burns's entry into 203 Lake Road was unlawful, I must

now determine whether any evidence should be suppressed as fruit of the poisonous tree under

the exclusionary rule.  *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United

States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994).  "The

exclusionary rule prohibits introduction into evidence of tangible materials seized during an

unlawful search, and of testimony concerning knowledge acquired during an unlawful search."

*Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal citations omitted).  This doctrine

applies not only to direct evidence, but also to tangible and testimonial evidence derived from the

tainted evidence "up to the point at which the connection with the unlawful search becomes so

attenuated as to dissipate the taint."  *Id.* at 537 (internal quotation omitted).

A.   **Physical Evidence**

Under the independent source doctrine, evidence originally discovered by illegal

means, but seized later pursuant to lawful means will not be suppressed.  *Murray v. United

States*, 487 U.S. at 542; *see also United States v. Johnson*, 994 F.2d 980, 987 (2d Cir.) ("[c]ourts

have applied the independent source exception in cases where the police stumble upon evidence

while engaging in an unlawful search or entry, but where there was an independent basis apart

from the illegal entry to allow a warrant to issue"), *cert. denied*, 510 U.S. 959 (1993); *United

States v. O'Brien*, 498 F. Supp. 2d 520, 540 (N.D.N.Y. 2007) ("[i]f police seize evidence

pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier

Fourth Amendment violation, there is an independent source for the seizure, and the evidence is

untainted and admissible"), *aff'd*, 303 F. App'x 948 (2d Cir. 2008).  The independent source

exception requires proof that:  "(1) the warrant . . . [is] supported by probable cause derived from

sources independent of the illegal entry; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct." *United States v. Bonczek*, 391 F. App'x 21, 24 (2d Cir. 2010) (citing *United States v. Johnson*, 994 F.2d at 987).

In this case, a federal search warrant was obtained following the warrantless entry into 203 Lake Road.  (Docket # 97-1).  Anticipating that the government would seek to rely upon the subsequently-issued warrant, defendants contend that the search warrant was based upon information discovered during the unlawful entry, and the warrant thus was not independent of the unlawful entry.[19]  (Docket # 123 at 19-20).  Defendants alternatively challenge the validity of the warrant under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), arguing that it was based upon material omissions and false or misleading information.[20]  (*Id.* at 20-24).

While the government maintains that the warrant did not contain false or misleading information or material omissions, it has not advanced the independent source doctrine to oppose suppression.  (Docket # 126).  Accordingly, the government has not attempted to establish either prong necessary to invoke the independent source exception.

With respect to the first prong of the exception, Burns's affidavit demonstrates that he relied almost exclusively upon observations made during the course of the unlawful entry

---

[19]  Defendants appear to analyze this issue under the inevitable discovery doctrine, rather than the independent source doctrine.  (Docket # 123 at 19).  In this case, the evidence was not seized until a federal search warrant had been obtained and executed, and thus "the proper question appears to be whether the warrant was supported by probable cause without regard to the illegal evidence."  *See United States v. Ahmad*, 2012 WL 1944615, *6 n.5 (W.D.N.Y.) (comparing *United States v. Cabassa*, 62 F.3d 470, 473 (2d Cir. 1995); *United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir. 1987) and *United States v. Arms*, 2002 WL 32781, *5 (E.D.N.Y. 2002)), *report and recommendation adopted*, 2012 WL 3028302 (W.D.N.Y. 2012).  In any event, the government has not attempted to rely upon the inevitable discovery doctrine and has not proffered any evidence to establish "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."  *United States v Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (citing *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) ("[u]nder the inevitable discovery exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would have lawfully discovered the evidence later")).

[20]  By letter dated March 24, 2014, the government withdrew its argument that the good faith exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897 (1984) applied to the seizure of the physical evidence from 203 Lake Road.  (Docket # 105).

to request the issuance of the warrant.  (Docket # 97-1 at 2-8).  Accordingly, the government has failed to establish that the warrant is "supported by probable cause derived from sources independent of the illegal entry."  *United States v. Bonczek*, 391 F. App'x 21 at 24.  Although "'the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant'[;] . . . [r]ather, a reviewing court 'should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant,'"  *United States v. Ahmad*, 2012 WL 1944615 at *6 (quoting *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)), in this case, the affidavit relies so heavily upon the observations made during the course of the unlawful entry that it is far from certain that probable cause to support the warrant exists in the absence of the illegally observed information.

Specifically, the affidavit describes Burns's investigation at 203 Lake Road, including his entry into the premises and his observations inside the residence of harvested marijuana plants and cultivated marijuana buds.  (*Id.* at ¶ 2).  Additionally, the affidavit states that during the course of a protective sweep of the entire premises, a marijuana grow operation was observed by law enforcement in the basement and on the second floor of the premises and that a rifle case, scope and gun cleaning kit were observed on the first floor.  (*Id.* at ¶¶ 2, 4). Based upon this information, Burns sought a warrant to search for evidence of the following crimes:

 (1) Criminal Possession of Marijuana Fifth in violation of New York Penal Law § 221.10;
 (2) Growing of the plant known as Cannabis by an unlicensed person in violation of New York Public Health Law § 3382; and
 (3) Criminal Possession of a Weapon Fourth in violation of New York Penal Law § 265.00.

(*Id.* at 3).

   Excising the observations made inside the residence, the application plainly lacks probable cause to believe that evidence of criminal possession of a weapon in violation of New York Penal Law § 265.00 would be found at 203 Lake Road.  Similarly, as discussed at length above, prior to the unlawful entry, the only evidence suggesting any criminal activity at 203 Lake Road was the smell of marijuana that Burns detected as he approached the door.  Although the smell may have provided probable cause to believe that a quantity of marijuana was contained inside, it did not provide a reasonable basis to believe that the marijuana was in plant form, an element of a violation of New York Public Health Law § 3382, or was of a quantity in excess of twenty-five grams, an element of criminal possession of marijuana in the fifth degree under New York Penal Law § 221.10.[21]  *See United States v. Bergin*, 732 F. Supp. 2d 1235, 1257 (M.D. Fla. 2010) ("the search warrant affidavit alleges that police officers observed drug paraphernalia, needles and pill bottles in the residence[;] . . . [t]he redacted affidavit in this case clearly fails [to establish probable cause] as to evidence of the possession of blank prescriptions, the only offense alleged in the search warrant"), *aff'd*, 455 F. App'x 908 (11th Cir.), *cert. denied*, 132 S. Ct. 1948 (2012); *United States v. Groce*, 255 F. Supp. 2d 936, 944 (E.D. Wis. 2003) ("[e]xcising from the warrant application the statement that [the officer] observed cocaine leaves absolutely nothing upon which probable cause to issue a search warrant could be based"); *United States v. Saari*, 88 F. Supp. 2d 835, 851 (W.D. Tenn. 1999) ("the search warrant affidavit relies entirely on the information observed during the initial unlawful entry[;] . . . [a]ccordingly, the search warrant did not purge the taint of illegality as it was based entirely on the fruit of the poisonous tree") (internal quotation omitted), *aff'd*, 272 F.3d 804 (6th Cir. 2001); *United States*

---

[21] These were the only crimes listed in the warrant.  Accordingly, the Court makes no findings as to whether the affidavit contained sufficient information to establish probable cause to believe that evidence of any other violations of the law was likely to be found within the residence.

*v. Arias*, 992 F. Supp. 832, 840-41 (S.D. W. Va. 1997) ("the government has failed to establish that the warrant . . . was based on information gathered from a source wholly independent of the prior illegal entry").

           Moreover, the record contains absolutely no evidence concerning the second prong of the independent source exception.  No witnesses testified about whether the officers would have sought a warrant for the house if they had not gone inside.  Thus, the government has failed to meet its burden of demonstrating the applicability of the independent source exception. *See United States v. Mowatt*, 513 F.3d 395, 404 (4th Cir. 2008) ("the government has never maintained that the officers would have sought a warrant absent their prior illegal discovery [of evidence;] [n]or does any evidence even suggest that they would have sought a warrant had they known only about the marijuana"), *abrogated on other grounds*, *Kentucky v. King*, 131 S. Ct. 1849 (2011); *United States v. Riccio*, 2011 WL 4434855, *3 (S.D. Cal. 2011) ("the record conclusively establishes that the information derived from the hard drive, and suppressed as a direct constitutional violation, prompted the decision by [law enforcement] to seek a federal warrant to search [d]efendant's home"); *United States v. Green*, 2010 WL 4877872, *10 (N.D. Ga.) ("the decision to seek the search warrant here was the direct result of the observations the officers made inside the apartment after their unlawful entry, and not the result of the independent information[;] . . . there is no evidence that [law enforcement] intended to seek a search warrant"), *report and recommendation adopted*, 2010 WL 4876898 (N.D. Ga. 2010); *United States v. Bergin*, 732 F. Supp. 2d at 1257-58 ("the motivation to obtain a search warrant was the direct result of the unlawfully obtained knowledge that the residence contained [evidence]"); *United States v. Ortega*, 2007 WL 3306612, *5 (M.D. Fla. 2007) ("the decision to seek the search warrant was the direct result of the observations and smells the officers made

inside the residence after their unlawful entry . . . was also in close proximity to the entry, and was motivated only by the contents of the house, not the initial smell of marijuana from the door step"); *United States v. Groce*, 255 F. Supp. 2d at 944 ("[i]t is also clear that the officers were motivated to seek the warrant because of [the officer's] search").  Accordingly, I recommend that the district court suppress the evidence seized from 203 Lake Road.[22]

### B.    Statements

Steven further contends that statements he made to law enforcement should be suppressed as fruit of the warrantless search.  (Docket # 123).  Although Steven clearly raised this issue in his motion, the government failed to respond to this particular argument.  I find that the record before the Court is nonetheless sufficient to allow the Court to conduct its own attenuation analysis.

The salient question is whether the statements made by Steven were so attenuated from the unlawful entry that suppression would be improper.  *United States v. Guzman*, 724 F. Supp. 2d 434, 444 (S.D.N.Y. 2010) ("[e]vidence, including statements, obtained subsequent to an unlawful search may be introduced when the causal link between a Fourth Amendment violation and a subsequent confession . . . is so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type") (internal quotations omitted).  "[A]ttenuation analysis 'is . . . appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal government activity.'"  *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006) (quoting *New York v. Harris*, 495 U.S. 14, 19 (1990)), *cert. denied*, 552 U.S. 836 (2007).

---

[22]  Having concluded that the evidence should be suppressed, I need not reach defendants' alternative argument that the warrant was invalid under *Franks* because it contained material omissions and false or misleading information.

46

The factors to be considered are:  "(1) the administration of the *Miranda* warnings, (2) the temporal proximity between the Fourth Amendment violation and the statements, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *United States v. Guzman*, 724 F. Supp. 2d at 444 (citing *Mosby v. Senkowski*, 470 F.3d at 521).  The government bears the burden of proving that "the statements were sufficiently attenuated to remove the taint from the unlawful search."  *Id.*

With respect to the first factor, Burns credibly testified that he administered the *Miranda* warnings prior to placing Steven inside his patrol vehicle.  Although this factor weighs against suppression, "[g]iving a defendant *Miranda* warnings [may] not break the causal chain between an illegal search and a subsequent confession." *United States v. Lawson*, 961 F. Supp. 2d 496, 507 (W.D.N.Y. 2013) (internal quotations omitted); *see United States v. Guzman*, 724 F. Supp. 2d 434, 444 (S.D.N.Y. 2010) ("*Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession") (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)).  The second and third factors, however, heavily weigh in favor of suppression as the statements were made while Steven was in custody at WPD subsequent to the unlawful entry, after he was confronted with items observed during the unlawful entry, and in the absence of any significant intervening circumstances.  *United States v. Seldinas*, 2014 WL 6669901, *7 (W.D.N.Y. 2014) ("[o]nce a defendant thinks that he has been caught red handed, the futility of remaining silent can be more easily exploited by law enforcement . . . because the realization that the cat is out of the bag plays a significant role in encouraging the suspect to speak") (quoting *United States v. Griswold*, 2011 WL 7473466, *11 (W.D.N.Y. 2011)) (internal quotation omitted).  I conclude that the final factor weighs slightly in favor of the government.

Although Burns's entry was unlawful, his actions do not appear to have been taken in bad faith. Weighing the four factors in their totality, the balance tips in favor of suppression.[23] *See United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003) (suppressing statements made by defendant a few hours after unlawful search during which gun was discovered; "[the officer] questioned [defendant] about the gun and, in response, [defendant] admitted to owning a gun[;] [u]nder the circumstances, it cannot be doubted that the search of [defendant's] bag led directly to his incriminating statements"); *United States v. Seldinas*, 2014 WL 6669901 at*7 ("[b]eyond pointing to the fact that [defendant] was Mirandized, the government makes no attempt to address why his statements were not tainted as the fruit of the illegal arrest[;] [t]herefore, I conclude that the government has failed to meet its burden of establishing the [defendant's] statements are not fruit of the poisonous tree"); *United States v. Lawson*, 2013 WL 4407100, *10 (W.D.N.Y. 2013) (suppressing statements made by defendant after unlawful search); *United States v. Griswold*, 2011 WL 7473466, *11 (W.D.N.Y. 2011) ("[o]f the various fruits present on the poisonous tree, perhaps the most easily identifiable is a confession resulting from an illegal search"); *Guzman*, 724 F. Supp. 2d at 443-44 (suppressing statement made immediately after officers conducted an unlawful search); *United States v. Breedlove*, 424 F. Supp. 2d 379, 387-88 (D. Conn. 2006) ("[n]othwithstanding the fact that defendant was given his *Miranda* warnings, the [g]overnment has not established that sufficient time elapsed or 'intervening circumstances' occurred so as to remove the taint" where approximately two hours elapsed between unlawful arrest and confession and "defendant waited in a holding cell, did not meet with a lawyer or make any phone calls, and did not speak with anyone other than law enforcement officers"); *United States v. Hiruko*, 320 F. Supp. 2d 26, 34-35 (E.D.N.Y. 2004) (statements suppressed as

---

[23] Having concluded that Steven's statements were not sufficiently attenuated from the unlawful entry, I need not address his Fifth Amendment challenge to the admissibility of the statements.  (Docket # 123 at 24-28).

fruit of unlawful arrest where defendants were taken to police station, provided *Miranda*

warnings and gave statements within approximately one hour of arrest; "[t]he government has

not even alleged an intervening event, and there was none[;] [t]he break in time between the

illegal arrests and the post-*Miranda* statements was quite short") (collecting cases); *United States*

*v. Santos*, 303 F. Supp. 2d 333, 349 (S.D.N.Y. 2003) (suppressing statements made by defendant

at police station following unlawful search of his apartment; "any statements that [defendant]

made following the unlawful recovery of the weapons and the unlawful arrest must be excluded

as fruits of the poisonous tree").

   With respect to the statements made by Timothy, neither party has addressed the

attenuation issue, which is likely to be a closer question because his statements were not made

until two days after the illegal entry.  Accordingly, the parties are directed to file supplemental

submissions regarding this issue, including their positions on whether an additional evidentiary

hearing is required.  Such submissions shall be filed by no later than **February 27, 2015**.

  **C.**  ***Herring v. United States*, 555 U.S. 135 (2009)**

   The Supreme Court has made clear that the fact that a Fourth Amendment

violation occurred does not automatically require exclusion of evidence obtained as a result of

the violation.  *Herring v. United States*, 555 U.S. at 140.  The exclusionary rule should apply

only where it would result in appreciable deterrence and where the benefits of deterrence would

outweigh its costs.  *Id.* at 141.  I recommend that the district court apply the exclusionary rule

here because (1) the government has failed to argue, let alone demonstrate, that it should not

apply, *see Seldinas*, 2014 WL 6669901 at *10 ("[*Herring*] is not an issue that is necessary for me

to resolve[;] [i]t is the government's burden to prove that the exclusionary remedy is not a proper

remedy for the violation of the Fourth Amendment, and it has made no attempt to satisfy that

burden") (internal quotation omitted); (2) the benefits of deterrence outweigh its costs in this

case, *see United States v. Lawson*, 961 F. Supp. 2d at 506 ("Here, the officers were clearly

charged with knowledge of the long-established rule 'that a search conducted without a warrant

issued upon probable cause is per se unreasonable . . . subject only to a few specifically

established and well delineated exceptions. . . . [S]ince I find that the government has failed to

prove [the exceptions], the police misconduct is sufficiently culpable that such deterrence . . . is

worth the price paid by the justice system.")


### III.    Timothy Race's Fifth Amendment Challenge to Statements

Finally, I turn to Timothy's Fifth Amendment challenge to the February 6, 2011

statements that he made prior to invoking his right to counsel.  Statements made during custodial

interrogation are generally inadmissible unless a suspect first has been advised of his rights

pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that

the prosecution may not use a defendant's statements that are the product of custodial

interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment

privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*,

384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional
> equivalent. . . . [T]he overarching "custody" question is whether a
> reasonable person in the suspect's position would have understood
> [him] to be subjected to restraints comparable to those associated
> with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) (internal quotations and brackets

omitted).

In the case at bar, the government does not contest that Timothy was subject to custodial interrogation.  The issue is whether Timothy was advised of his rights and voluntarily waived them before speaking with Reed.  To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In this case, I find that the government has established that Timothy was properly advised of his *Miranda* rights when Reed read them verbatim from a rights form.  Reed then read the two waiver questions from the card to Timothy.  Timothy indicated that he was willing to speak with the Reed.  According to Reed, Timothy did not appear to be under the influence of drugs or alcohol and was not threatened or promised anything to induce him to speak.  Timothy ultimately requested an attorney, indicating his awareness of his rights, and the government properly does not seek to introduce any later statements made by Timothy.

On this record, I find that Timothy's waiver was knowing and voluntary.  I recommend that the district court deny Timothy's motion to suppress his statements on the grounds that they were obtained in violation of his Fifth Amendment rights.

## CONCLUSION

For the reasons stated above, I recommend that defendants' motions to suppress tangible evidence seized from 203 Lake Road (Docket ## 75, 97, 106, 123) and Steven Race's motion to suppress statements (Docket ## 97, 123) be granted.  I also recommend, for the reasons stated above, denial of Timothy Race's motion to suppress statements on the grounds

that they were obtained in violation of his Fifth Amendment rights.  I reserve on the question of whether Timothy's statements were sufficiently attenuated from the unlawful entry to avoid suppression as a fruit of the unlawful entry and search pending further briefing by the parties. (Docket # 106).  Oral argument on those supplemental submissions shall be heard on **March 4, 2015, at 9:30 a.m.**

**IT IS SO ORDERED.**


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
      February 11, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[24]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      February 11, 2015

---

[24] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).